**Reloynne K. VILLIARIMO; Joseph Harvest, Plaintiffs–Appellants,**

**v.**

**ALOHA ISLAND AIR, INC., dba Island Air; Rosie Nenezich; Richard Hee, Defendants–Appellees.**

No. 00–16012.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2001

Filed Feb. 28, 2002.

G. Todd Withy (argued), Honolulu, HI, for the plaintiffs-appellants.

Richard M. Rand (argued) and Christine S.Y. Chun, Torkildson, Katz, Fonezca, Jaffe, Moore & Hetherington, Honolulu, HI, for the defendants-appellees.

Before: THOMPSON, O'SCANNLAIN, and BERZON, Circuit Judges.

O'SCANNLAIN, Circuit Judge.

In this employment discrimination case, we must decide whether claims by ground personnel against an airline prevail over its termination for damage to one of its aircraft.

## I

Reloynne Villiarimo worked as a ramp supervisor for Aloha Island Air, Inc. ("Aloha"). Joseph Harvest worked as a ramp agent under the supervision of Villiarimo, among others. Both were involved in an accident that occurred on April 6, 1998, which resulted in damage to one of Aloha's airplanes; thereafter, both were let go. Aloha maintains that it terminated Villiarimo for a rule violation in connection with the accident, and because it believed she had been dishonest during the investigation of the accident, and that it terminated Harvest because the occurrence was his second such accident. Although Villiarimo and Harvest admit that they in fact damaged an airplane, they nonetheless contend that "real" reasons for their terminations were more nefarious—and indeed, illegal under federal and state employment discrimination laws.

## A

On April 6, 1998, Villiarimo and Harvest worked together on a flight departure on the tarmac at Honolulu International Airport, Hawaii. Villiarimo was the marshaller,[1] and Harvest was the Ground Power Unit ("GPU") operator.[2] Both recount the events of that fateful day as follows.

As the GPU operator, Harvest's responsibilities included driving a small vehicle (called a "tug") to which the GPU was attached, and connecting the GPU to airplane engines with a power cord for start up. After connecting the plane on which he and Villiarimo worked to the GPU, Harvest stood at the GPU and waited for the disconnect sign from Villiarimo. On receiving that signal, he was to turn off the GPU, unplug the GPU from the aircraft, board the tug, and drive the GPU away from the aircraft.

At some point, Villiarimo received a signal from the flight's captain to disconnect the GPU. She then gave the disconnect signal to Harvest. Harvest turned off the GPU. Before unplugging the GPU power cord from the aircraft, however, Harvest attempted to unlock the brake on the tug. He had difficulty unlocking the brake.

Villiarimo and Harvest both testified that Villiarimo left her position at the front of the aircraft to help Harvest. Villiarimo yelled to Harvest, "get the tug. I'll get it," meaning the GPU cord. Harvest mounted the tug. Villiarimo disengaged the brake and, while returning to her position at the front of the aircraft, signaled Harvest to drive away. Harvest drove off, but soon felt a "jerk": neither Harvest nor Villiarimo had disconnected the GPU cord from the aircraft. The cord was forcibly yanked from the plane causing severe damage. Consequently, Aloha grounded the aircraft, the flight was cancelled, and the passengers were forced to deplane.

## B

Shortly after these events occurred Paul Meyer, Aloha's Security Director, opened an investigation. Both Villiarimo and Harvest filed incident reports regarding the accident. Both admitted that they failed to disconnect the GPU cord from the aircraft, and that they thereby damaged the aircraft. Three other witnesses, however—including two pilots—stated, contrary to the representations of Villiarimo and Harvest, that Villiarimo never left her marshalling position at the front of the aircraft before Harvest pulled the GPU from the aircraft.

---

1. The marshaller communicates with the pilots. She stands at the front of the aircraft and directs ground preparations for the flight.

2. Ground Power Units are used to provide the electric power required to start a jet engine.

Villiarimo took responsibility for failing to disconnect the GPU cord before telling Harvest to drive the tug away. Because of this, and because her version of the accident did not match the versions given by three witnesses, Aloha terminated her for procedural violations and for dishonesty.[3] As for Harvest, it turned out that the April 6 incident was actually his second accident involving a failure to unplug a GPU before driving it away from a plane: approximately one year earlier Harvest damaged another aircraft in the same way. After investigation of that earlier occasion, Aloha suspended Harvest for one week and warned him that future ramp safety violations would result in his termination. Thus, after its investigation of the April 6 incident, and in accord with its earlier warning, Aloha terminated Harvest for repeated violations of company rules.

Both Harvest and Villiarimo appealed their terminations through company procedures. The composition of the boards that reviewed both appeals was identical; the same three Aloha officers sat on both boards. Both terminations were affirmed.

### C

Despite the evidence against them, both Villiarimo and Harvest contend that they were not actually let go because they damaged the airplane on April 6. Instead, they allege that various discriminatory or other-wise unlawful animuses actually led to their firings.

### 1

Villiarimo argues that she was actually fired for discriminatory reasons, namely (i) that she is a woman, or (ii) that she once filed a Wage & Hour Complaint against Aloha, or (iii) both.

Villiarimo contends that her firing was motivated by gender-based discrimination. She points out that in her action before the Hawai'i Department of Labor and Industrial Relations ("DLIR"), appealing an administrative officer's decision that she was not qualified for unemployment benefits because of her termination, the DLIR determined that she was discharged for reasons other than misconduct connected to her work. She also contends that there is evidence that she was replaced by a male.[4] Villiarimo even marshals statistics: she states that only three of thirty-three (or 9.1%) of Aloha's ramp agents on Oahu between January 1995 and February, 2000 were women—and that, between 1995 and her termination in 1998, she was the only female ramp supervisor. Finally, she claims that male ramp agents who accidentally pulled out GPU plugs were punished less severely than she was.[5]

Villiarimo also contends that she was fired in retaliation for filing a wage and hour complaint against Aloha with the DLIR.[6] Although Villiarimo cannot re-

---

**3.** Aloha also observed that, had Villiarimo's story been true, she would have been guilty of a second procedural infraction—failure to signal the pilots before leaving her post.

**4.** The evidence of this alleged fact is sparse. Villiarimo relies solely on the deposition testimony of Rosie Nenezich, Aloha's Director of Airport Services. In that deposition, though, Nenezich testified only that after Villiarimo left her job was "posted," and Nenezich "couldn't say" who got it. She *speculated*

that it might "perhaps" have been "Errol Mercardo," or "Todd Soga."

**5.** Villiarimo cites only her own self-serving and uncorroborated affidavit and deposition testimony in support of this assertion, and provides no indication how she knows this to be true.

**6.** Although the complaint itself is not in the record, it appears that Villiarimo alleged that she was incorrectly compensated for overtime.

member when she filed the complaint, a letter from the DLIR indicates that it was filed sometime before June 18, 1997.

### 2

Like Villiarimo, Harvest contends that he was actually let go for discriminatory reasons. He offers three possible reasons: (i) that he had complained that Lisa Wall was sexually harassing him, or (ii) that he signed an authorization for the DLIR to review his employment records in connection with the investigation stemming from Villiarimo's Wage & Hour complaint, or (iii) both.

■ Harvest alleges that Aloha terminated him in retaliation for his having complained about sexual harassment at the hands of Lisa Wall, Aloha's Honolulu Station Manager. As Station Manager, Wall was several managerial rungs above Harvest on the Aloha corporate ladder. Harvest alleges that Wall harassed him, and points to two different instances of harassment, both of which occurred in or before December, 1996. Harvest testified that, in front of Villiarimo and two other of Harvest's supervisors, Wall once rubbed the middle of Harvest's chest through his tanktop and commented, "[I] never saw a chest like this before." He also testified that Wall referred to him as "JJ, my man." Harvest testified that he complained to his immediate supervisor, Robert Lorin, telling him that Wall's behavior made him feel "funny." Lorin asked him

to put his complaint in writing, noting that it was "serious." Harvest eventually did so. He admits that, after an investigation of his complaint, Wall apologized to him in front of Villiarimo.[7]

Harvest also claims that he was terminated as a result of Villiarimo's Wage & Hour complaint. Unlike Villiarimo, Harvest did not himself make any such complaint; rather, Harvest alleges that he "facilitat[ed]" the investigation spawned by Villiarimo's claim. Although Villiarimo testified that she never discussed the complaint with Harvest, he appears to contend that his authorizing the DLIR to review his employment records was sufficient to incur Aloha's wrath.

### D

After their terminations, both Harvest and Villiarimo filed complaints with the Hawai'i Civil Rights Commission ("HCRC"). Villiarimo alleged that she was "terminated due to [her] Sex (Female)," based on three reasons: "I was the only female Ramp Agent working for [Aloha]," "Male Ramp Agents, who were involved in similar procedural violations were not terminated," and "I believe that were it not for my sex I would not have been terminated from my position."

The HCRC returned a finding of "no cause." In its decision it explained to Villiarimo that

---

**7.** Harvest testified that after the apology, Wall began to retaliate against him in various ways for complaining. For example, he testified that after the apology, Wall began to "pick on" him, telling him not to speed on the ramp, not to manhandle equipment, and not to smoke in an area not designated as a smoking area. He also claims that Wall once adjusted his time card improperly—although, after he complained to management, his time was readjusted, and he received all the pay he was due. None of these allegations of retalia-

tion are before us, however, because all occurred before Harvest was terminated, and although he thus could have raised them in his administrative complaint, he did not do so. *See Anderson v. Reno,* 190 F.3d 930, 938 (9th Cir.1999) ("[A]dministrative exhaustion is generally a prerequisite to obtaining judicial review."). Accordingly, we address only Harvest's contention that his termination constituted retaliation for his filing a sexual harassment complaint.

you could not rebut [Aloha's] contention that you were involved in procedural violations though you insisted that the accident report you submitted was accurate. You also indicated that the male ramp agent involved in this accident was also terminated. You could not rebut [Aloha's] contention that there have been and are female ramp agents and other management personnel employed by [Aloha]. And, you could provide no additional evidence to support your allegation that sex was a factor in your termination.

The HCRC then issued Villiarimo a "right to sue" letter.

Harvest alleged that he was terminated from his position "in retaliation for filing a sexual harassment complaint" based on three reasons: "Shortly after I filed a sexual harassment complaint against the Station Manager I was terminated," "Other Ramp Agents who were involved in similar procedural violations for which I was cited were not terminated," and "I believe that were it not for retaliation, by [Aloha], I would not have been terminated from my position." The HCRC returned a finding of "no cause." It also issued Harvest a "right to sue" letter.

Villiarimo and Harvest then brought this suit in Hawai'i state court. Aloha removed the case to the United States District Court for the District of Hawai'i. The court granted summary judgment for Aloha and the co-defendants on all counts in an unpublished decision. *See Villiarimo v. Aloha Island Air, Inc.,* No. CV–99–00252–SPK (D.Haw. Apr. 3, 2000). This timely appeal followed.

## II

### A

■   In reviewing this appeal from a grant of summary judgment we, like the trial court, must draw all reasonable inferences supported by the evidence in favor of the non-moving party. We must then decide whether any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law. *See Berry,* 175 F.3d at 703. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, this court has refused to find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving" testimony. *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996); *see generally Johnson v. Washington Metro. Transit Auth.,* 883 F.2d 125, 128 (D.C.Cir.1989) (discussing cases in which self-serving testimony uncorroborated by other evidence did not create a genuine issue of material fact).

We analyze first those claims unique to Villiarimo, then take up those claims unique to Harvest, and conclude with claims common to both.

### B

Villiarimo contends that her termination constituted sex-based discrimination in violation of both federal and state law. We address each in turn.

#### 1

■   Villiarimo first alleges that she was terminated because of her sex, in violation of Title VII. Under Title VII, an employer may not "discriminate against an individual with respect to his … terms, conditions, or privileges of employment" because of her sex. 42 U.S.C. § 2000e–2(a). This provision makes "disparate treatment" based on sex a violation of federal law. *See Llamas v. Butte Comm. College*

*Dist.*, 238 F.3d 1123, 1126–27 (9th Cir. 2001).

The parties agree that the proper legal framework for considering the grant of summary judgment on this claim is that of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, to show disparate treatment under Title VII Villiarimo must first establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. Specifically, she must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably, or her position was filled by a man. *Id.; St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). This Court has explained that under the *McDonnell Douglas* framework, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994) (citation omitted).

If the plaintiff establishes a prima facie case, the burden of production—but not persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer does so, the plaintiff must show that the articulated reason is pretextual "either directly by persuading the court that a discrimina-

tory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang v. University of California Davis*, 225 F.3d 1115, 1123 (9th Cir.2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir.1998).

Finally, if the plaintiff can show pretext, then the *McDonnell Douglas* framework "disappear[s]," and "the sole remaining issue [i]s 'discrimination *vel non.*'" *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Of course, "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 143, 120 S.Ct. 2097.

Although we are not entirely certain that Villiarimo has established a prima facie case of discrimination, even given the low threshold of evidence required to do so,[8] we need not resolve this question definitively. As the district court recognized, even if Villiarimo made out her prima facie case, she has not demonstrated that Aloha's explanations for her termination (her violation of company procedures and her perceived dishonesty during the ensuing

---

**8.** As the district court correctly observed, it is not clear that Villiarimo has produced sufficient evidence regarding the second prong, i.e., that she was qualified for the position. *See Villiarimo*, No. CV–99–00252–SPK, slip op. at 7–8. Villiarimo admits that Aloha told her that she was fired because she did not perform her job satisfactorily. She does not

dispute that on April 6, 1998 she failed to disconnect the GPU cord before signaling Harvest to drive his tug away. Thus, it is not clear that Villiarimo was performing her job "well enough to rule out the possibility that [s]he was fired for inadequate job performance." *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir.1988).

investigation) are pretextual. *See Villiarimo*, No. CV–99–00252–SPK, slip op. at 10–11. That is, she has not shown that "either ... a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1123.

■ To show pretext Villiarimo first challenges Aloha's proffered reasons for her termination. She argues that Aloha changed its reasons over time, initially stating that Villiarimo was terminated for lying during the investigation, then stating that she had committed a procedural violation by leaving her post without signaling the pilot. The evidence, however, forecloses this contention. Villiarimo admits that she was told from the outset that she was terminated *both* (i) because of a procedural violation, and (ii) because she was dishonest. And Aloha's investigative report cites both reasons. Nor are these reasons inconsistent; they simply show that, whether the Aloha's three witnesses were lying or Villiarimo was lying, Villiarimo's termination was justified. This does not show pretext. *See, e.g., Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733–34 (7th Cir.2001) (explaining that while pretext can be demonstrated by "not only shifting but also conflicting, and at times retracted, justifications for adverse treatment," it is not shown where an employer "simply supplemented its explanation" where "there has been no retraction of any of its reasons," and "nor are any of its reasons inconsistent or conflicting"); *cf. Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir.1997) (holding, in context of retaliation, that the presence of "shifting" or different justifications for an adverse action is not sufficient to defeat summary

judgment when those justifications "are not incompatible").

■ Villiarimo next attacks the credibility of the three witnesses who said she never left her post. Her attacks, however, are unavailing. In judging whether Aloha's proffered justifications were "false," it is not important whether they were *objectively* false (e.g., whether Villiarimo *actually* lied). Rather, courts "only require that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Johnson*, 260 F.3d at 733. As the district court correctly observed, Villiarimo presented no evidence that Aloha did not honestly believe its proffered reasons.

■ Finally, Villiarimo argues that because a state agency found—albeit in a very different context (unemployment benefits)—that she was not fired for work-related misconduct, there must be a genuine issue of material fact. Backing off the argument advanced in her opening brief, that this finding should be afforded collateral estoppel, Villiarimo now contends only that because "one neutral factfinder found that the reasons given by the employer were untrue," there must be a genuine issue of material fact. Villiarimo is incorrect. As Aloha notes, the findings of the unemployment tribunal do not show that Aloha discriminated. They are, instead, based on the rejection of Aloha's "hearsay" evidence. They thus do not impugn Aloha's belief in its proffered reasons for Villiarimo's termination.

■ Because Villiarimo has not shown that the reasons Aloha offers for her termination are pretextual, then, her claim for gender-based discrimination in. violation of Title VII must fail.[9]

---

9. We note that, given our conclusion that Villiarimo has failed to show pretext, her

heavy reliance on *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097,

### 2

■■■ Villiarimo also contends that her termination was gender-based discrimination in violation of Hawai'i law. The analysis of this claim is identical in all relevant respects to the analysis of her Title VII claim: Hawai'i courts use the *McDonnell Douglas* burden-shifting approach in analyzing these claims. *See Shoppe v. Gucci America, Inc.*, 94 Hawai'i 368, 14 P.3d 1049, 1059 (2000) ("When analyzing an individual's disparate treatment claim that relies on circumstantial evidence of employer discrimination, we have previously applied the burden-shifting analysis set forth by the United States Supreme Court in [*McDonnell Douglas*]"). Villiarimo's state-law discrimination claim must therefore fail for the same reasons that her federal claim fails: even if she has proven a prima facie case of discrimination, she has failed to demonstrate that the legitimate, non-discriminatory reasons for her termination offered by Aloha for her termination are pretextual.

### C

We next address Harvest's claims. Harvest argues that his termination was actually retaliation for his claim of sexual harassment, in violation of Title VII. He also argues that Aloha was negligent by unreasonably failing to "provide [him] with a safe and secure workplace free from discrimination based on sex and retaliation." We take each claim in sequence.

### 1

■■■ Harvest first asserts that he was actually terminated in retaliation for com- plaining about sexual harassment in violation of Title VII. If Harvest can establish a prima facie case by showing that: 1) he engaged in a protected activity; 2) he suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision, *see Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987), then *McDonnell Douglas* burden-shifting is appropriate. *See Tarin v. County of Los Angeles*, 123 F.3d 1259, 1264 (9th Cir. 1997).

■■■ We conclude that Harvest has failed to establish his prima facie case. Certainly, Harvest has demonstrated that he engaged in a protected activity. He testified that he filed an internal complaint regarding Wall's sexually harassing behavior. *See, e.g., Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir.1992) (finding internal complaint to company management was protected under Title VII, noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint") (internal quotation marks omitted). And certainly, Harvest has suffered an adverse employment action: Aloha terminated him. *See Little v. Windermere Relocation, Inc.*, Slip Op. at 1041, 2002 WL 84237, at *7, —— F.3d ——, —— (9th Cir. Jan. 23, 2002) (as amended) ("[O]f course, termination of employment is an adverse employment action. . . ."). Harvest has not, however, demonstrated causation.

■■■ To establish causation Harvest must show "by a preponderance of the

147 L.Ed.2d 105 (2000) is misplaced. That case stands for the proposition that at the final step of *McDonnell Douglas* burden-shifting, "a plaintiff's prima facie case, *combined with sufficient evidence to find that the employer's asserted justification is false,* may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 147, 120 S.Ct. 2097 (emphasis added). Because Villiarimo has not shown that Aloha's reasons are pre-textual, she does not even reach the final stage of adjudication contemplated by *Reeves*.

evidence that engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired." *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir.1986) (quoting *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 345 (9th Cir.1982) (per curiam)). Harvest argues only that his termination "followed Harvest's sexual harassment complaint." This is true, but incomplete: in fact, the termination occurred nearly a year and a half after the complaint.

▌ We have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone); *see also Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir.1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); *Yartzoff*, 809 F.2d at 1376 (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first

investigated, and less than two months after investigation ended). But timing alone will not show causation in all cases; rather, "in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after the employee's protected expression.'" *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir.2000). A nearly 18–month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation. *See id.* (finding that a one-year interval between the protected expression and the employee's termination, standing alone, is too long to raise an inference of discrimination); *see also Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398–99 (7th Cir.1999) (four months too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir.1998) (eight months), *cert. denied*, 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998) (five months); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four months). Thus, we conclude that Harvest's claim for retaliation in violation of Title VII is without merit.[10]

10. The district court concluded, as we do, that Harvest failed to show causation. *See Villiarimo*, No. CV–99–00252–SPK, slip op. at 8. The court also held, in the alternative, that even if Harvest had made out his prima facie case, his claim could not survive *McDonnell Douglas* burden shifting because he could not demonstrate pretext. *Id.* at 8.

We agree with the district court. After the first time Harvest damaged a plane by failing to disconnect a GPU, Aloha warned him that a second offense would lead to termination. He committed that second offense on April 6, 1998. After investigating, Aloha concluded that Harvest was at fault in the incident. And while he claims on appeal that "the 1998 incident was not his fault" because Villiarimo told him to drive away, he does not dispute that he failed to unplug

the GPU before driving away, or that he damaged an aircraft by so doing.

Indeed, Harvest has not offered *any* evidence to show that Aloha did not believe its reason for terminating him, or that this reason is unworthy of credence. He argues only that "a jury could infer that" the "real" reason for his discharge was his complaint of sexual harassment, made a year and a half previously. Harvest, though, misunderstands the law. At summary judgment, this court need not draw *all* possible inferences in Harvest's favor, but only all *reasonable* ones. *See O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1466–67 (9th Cir.1986) ("We scrutinize the *evidence* and *reasonable inferences* to determine whether there is sufficient probative evidence to permit 'a finding in favor of the opposing party based on more

## 2

Harvest also claims that Count IV of his First Amended Complaint states a cause of action for "the common law tort of sexual harassment." But even assuming that such a claim exists—and we have found no Hawai'i case law holding that it does [11]—Harvest's Count IV does not contain a claim for common law sexual harassment. It contains a claim for negligence; the full count alleges that "Defendant is liable to Plaintiff[ ] *for negligence by unreasonably failing to* ... provide Plaintiffs with a safe and secure workplace free from discrimination based on sex and retaliation." The district court was thus correct to conclude that Harvest did "not su[e] for sexual harassment." *Villiarimo,* No. CV–99–00252–SPK, slip op. at 13. Because Harvest neither pled such a claim nor argued it before the district court, he cannot assert it for the first time on appeal. *See Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1035 (2d Cir.1997) (rejecting plaintiffs' attempt to recharacterize claim for intentional infliction of emotional distress as claim for negligence on appeal); *see also King v. AC & R Advertising,* 65 F.3d 764, 769 n. 1 (9th Cir.1995) (expounding the general rule that issues not raised below will not be considered on appeal).

### D

Finally, both Villiarimo and Harvest raise an additional two state law claims in connection with their terminations—one for firing in violation of public policy, and the other for intentional infliction of emotional distress.

## 1

Villiarimo and Harvest first assert a *Parnar* claim, so called in honor of *Parnar v. Americana Hotels,* 65 Haw. 370, 652 P.2d 625 (1982), in which the Hawai'i Supreme Court first announced that under the common law of Hawai'i, "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." *Id.* at 631. Villiarimo and Harvest contend that they were terminated in connection with Villiarimo's Wage & Hour complaint, in violation of public policy.

For the purposes of *Parnar* claims, the Supreme Court of Hawai'i has explained that

> [i]n determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.... However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

*Parnar,* 652 P.2d at 631. "The plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy." *Id.*

The parties before us disagree on the statutory basis of the public policy that Villiarimo and Harvest assert to vindicate with their *Parnar* claim. Ultimately, it appears that the provision on which they base their claim is Hawai'i Revised Stat-

---

than mere speculation, conjecture, or fantasy.' ") (emphasis added).

**11.** Indeed, there is every indication that a claim for sexual harassment under Hawai'i law, as under federal law, is statutory in nature. *See* Haw.Rev.Stat. § 378–2(1)(A) ("It shall be an unlawful discriminatory practice

... Because of ... sex ... For any employer ... to discriminate against any individual ... in the terms, conditions, or privileges of employment ...."); *see also Steinberg v. Hoshijo,* 88 Hawai'i 10, 960 P.2d 1218, 1226 (1998) (explaining that sexual harassment violates Hawaii Revised Statutes § 378–2(1)(A)).

utes chapter 387.[12] The Hawai'i courts have not yet addressed whether plaintiffs may bring a *Parnar* claim of this kind. Fortunately, however, we need not predict how the Hawai'i Supreme Court would determine this issue, for regardless of whether chapter 387 can form the basis of a *Parnar* action, Hawai'i law indicates that the appellants have not produced sufficient evidence to survive summary judgment on such a claim, even if it does exist.

■ In expounding the public policy tort announced in *Parnar*, Hawai'i courts have made several things clear. First, *Parnar* itself explains that "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." *Parnar*, 652 P.2d at 625. Second, the cause of action exists only when a plaintiff has engaged in one of a selected few protected activities:

> Those courts that have adopted the public policy exception have applied it to actions against an employer by an at will employee who was discharged for: (1) refusing to commit an unlawful act, such as refusing to give false testimony at a trial or administrative hearing; (2) per-

forming an important public obligation, such as jury duty, whistle blowing, or refusing to violate a professional code of ethics; and (3) exercising a statutory right or privilege, such as filing a worker's compensation claim.

*Smith*, 865 P.2d at 173–74 (citing D. Perry, *Deterring Egregious Violations of Public Policy: A Proposed Amendment to the Model Employment Termination Act*, 67 Wash. L.Rev. 915, 917–18 (1992)). These two precepts, taken together, point to a third: there must be some evidence of a causal connection between the termination and the protected action. *Cf. Crosby v. State Dept. of Budget & Finance*, 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994).

■ Given these principles, Harvest's claim must fail. He did not engage in the activities described by (1) or (3) above. Nor did any of his actions qualify as "performing an important public obligation." He did not engage in "whistleblowing"; indeed, he admits that he never complained of a wage or hour violation. And although Harvest alleges that he "facilitated" the investigation spawned by Villiari-

---

12. The appellants' complaint does not identify a statute that embodies the public policy they believe Aloha contravened. Nor did they point to such a statute in opposing summary judgment below. Faced with this lacuna, the district court apparently concluded that the underlying statute was Haw.Rev.Stat. Chapter 378 (discriminatory practices). *See Villiarimo*, No. CV–99–00252–SPK, slip op. at 14 (concluding that the *Parnar* claim must fail because such "public policy" torts are barred where an adequate statutory remedy exists, and Chapter 378 provides an adequate statutory remedy).

> On appeal, Villiarimo and Harvest correctly observe that Chapter 378 does not deal with Wage & Hour complaints. Forced to commit, they now point to Chapter 388 as the relevant statute, and conclude that their claim for termination in violation of the policy expressed in that statute exists under Hawai'i law. They rely principally upon

*Smith v. Chaney Brooks Realty, Inc.*, 10 Haw.App. 250, 865 P.2d 170 (1994), in which the Hawai'i Court of Appeals concluded that Haw.Rev.Stat. ch. 388 supports a public policy tort claim brought by an employee who alleged wrongful dismissal for having inquired into a pay deduction. Appellees, however, contend that the relevant statute is Haw.Rev.Stat. ch. 387. Because Villiarimo's complaint was based on the fact that she was not paid for overtime, the appellees have the better of the argument. *See* Haw.Rev.Stat. § 387–3 ("No employer shall, except as otherwise provided in this section, employ any employee for a workweek longer than forty hours unless the employee receives overtime compensation for the employee's employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which the employee is employed.").

mo's complaint by authorizing the Department to examine his records, he produced no evidence to support that Aloha knew of any such "facilitation." Thus, he failed to show any connection at all between his facilitation and his termination.

Villiarimo's claim, too, cannot survive summary judgment. While there is no question that her filing of a Wage & Hour complaint was a protected activity, she has failed to demonstrate any causal connection between the complaint and her termination. There is no direct evidence that Aloha terminated her because of her complaint; indeed, all of the evidence indicates that she was terminated because of the April 6 accident. *Compare Parnar v. Americana Hotels, Inc.*, 117 Lab. Cas. P 56,429, 1987 WL 200935 (Haw.1987) (*Parnar II* ) (affirming trial court's denial of a directed verdict where there was evidence that management personnel, *inter alia,* "describe[d] Parnar as a 'liability' to the hotel"). Moreover, the termination occurred nearly ten months after Villiarimo filed her complaint: she complained before June of 1997, but she was not fired until April of 1998. Thus, there was no temporal proximity between the protected action and the termination to give rise to an inference of causation. *Compare Parnar,* 652 P.2d at 626–27 (lapse of one month between protected action and termination sufficient to create genuine issue on wrongful termination claim).

### 2

▮ Lastly, Villiarimo and Harvest claim that the district court erred when it granted summary judgment on their claims of intentional infliction of emotional distress. Under Hawai'i law, the elements of that tort include: "(1) that the act allegedly causing harm was intentional; (2) that the act was unreasonable; and (3) that the actor should have recognized that the act

was likely to result in illness." *Marshall v. Univ. of Hawai'i,* 9 Haw.App. 21, 821 P.2d 937, 947 (1991).

▮ The district court correctly granted summary judgment to Aloha on this claim. As that court explained, Villiarimo and Harvest produced

> no evidence of "outrageous" conduct necessary for an intentional [infliction of] emotion distress claim. *See Ross* [*v. Stouffer Hotel Co.,* 76 Hawai'i 454, 879 P.2d 1037, 1048 (1994)]. IIED liability generally requires conduct "so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46(d), at 72 73. Even if there were liability for Title VII violations, there is nothing approaching the standard for IIED in the current record. *See Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991, 996 (D.Haw.1988) (holding that employer must have engaged in conduct going beyond merely firing employee for unfair reasons).

*Villiarimo,* No. CV–99–00252–SPK, slip op. at 12.

### III

This is a relatively straightforward case. Villiarimo and Harvest worked for an airline. They severely damaged one of its airplanes. Understandably perturbed with the damage to its aircraft, the airline fired them. Simple common sense indicates that this was a fair—albeit perhaps not a necessary—result. The district court was correct to grant summary judgment in this case, and we applaud its well-reasoned disposition doing so. In affirming that decision, we echo that court's tactfully understated conclusion: "Although job termination is serious, the Court finds

that the Defendants have no civil liability for the terminations at issue here." *Villiarimo,* No. CV–99–00252–SPK, slip op. at 17.

**AFFIRMED.**