Michael Alan JOHNSON,
et al., Plaintiffs,

v.

THE CITY OF SEATTLE,
et al., Defendants.

Christopher J. Shirley, Plaintiff,

v.

The City of Seattle, et al., Defendants.

No. C03–2418L.

United States District Court,
W.D. Washington,
at Seattle.

March 16, 2005.

Karen Kathryn Koehler, Michael E Withey, Stritmatter Kessler Whelan, Withey Caluccio (Sea), Seattle, WA, for Michael Alan Johnson, Jesse Wilson, Jr, Allison Wilson husband and wife, Summer Thuney, Jessica Arnold, Adam Lazara, Ralph Radford, Stacey E Smith, Howard Jensen, Kai A Ralls, Plaintiffs.

Anne Melani Bremner, Scott Bissell, Raul R. Martinez, Stafford Frey Cooper, Seattle, WA, Blake Edward Marks–Dias, Riddell Williams, Seattle, WA, for City of Seattle, Paul Schell, defendants.

Anne Melani Bremner, Scott Bissell, Raul R. Martinez, Stafford Frey Cooper, Seattle, WA, Blake Edward Marks–Dias, Riddell Williams, Seattle, WA, Theron A Buck, Stafford Frey Cooper, Seattle, WA, for R. Gil Kerlikowske Chief of Police, defendant.

John WS Acheson, III, Acheson Law Offices, Bellevue, for Christopher J Shirley Plaintiff.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

LASNIK, District Judge.

## I. INTRODUCTION

This matter comes before the Court on a motion filed by defendants The City of Seattle, *et al.* (collectively, "defendants") for summary judgment on plaintiffs' two remaining claims. (Dkt.# 64). Plaintiffs suffered injuries from assaults by third parties that occurred in the Pioneer Square area of Seattle on February 27, 2001 during the "Mardi Gras Riot."

Plaintiffs allege that defendants, who include the City of Seattle, former Mayor Paul Schell, and Seattle Police Chief Gil Kerlikowske, violated plaintiffs' constitutional rights and are therefore liable pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs contend that defendants' policy of not intervening as the Mardi Gras Riot progressed created a danger of private violence and violated their "rights of life, liberty, freedom, and bodily integrity." *See* U.S. Const., Amdt. 14, § 1 ("no State shall ... deprive any person of life, liberty, or property, without due process of law"). The Court previously dismissed plaintiffs' outrage claim, but found that plaintiffs' complaint sufficiently alleged Section 1983 and negligence claims. (Dkt. ## 38, 43).

For the reasons set forth in this Order, the Court grants defendants' motion for summary judgment.

## II. DISCUSSION

### A. Background Facts.

#### 1. Events Prior to Fat Tuesday.

In February 2001, private businesses sponsored events in Seattle's historic Pioneer Square neighborhood to celebrate Mardi Gras. The events were scheduled to

begin on Friday, February 23 and end on Tuesday, February 27, "Fat Tuesday." During prior years, the Mardi Gras celebrations had been peaceful, and the police department expected that trend to continue.

Contrary to expectations, problems arose on the first night. On Friday night, police determined that the drunken crowd had become a threat to public safety and at around 2 a.m., they ordered the crowd to disperse. The police released chemical munitions to clear the crowd after they ignored a second dispersal order. Although the police department revised its operational plan for Saturday night, including enlarging the number of assigned officers, the crowd again engaged in riotous behavior. Around 11 p.m., officers were ordered to withdraw from the crowd to transition into protective equipment, referred to as "hardening up." When officers subsequently attempted to move the crowd, they were pelted with rocks and bottles. After the officers deployed chemical munitions, the crowd splintered into two groups, leaving some officers surrounded or flanked. Some individuals broke windows and looted retail establishments, and one officer suffered a broken arm while trying to apprehend a suspect. Although officers were assaulted with rocks and bottles on Friday and Saturday nights, there were no serious injuries to celebrants by other members of the crowd. The events on Sunday and Monday nights were relatively quiet.

## 2. Fat Tuesday.

Prior to the commencement of the 2001 Mardi Gras events, the police department drafted an operational plan to handle the Fat Tuesday celebration based on the relative peace of past celebrations. After the events of Friday and Saturday nights, offi-cers met on Sunday to revise the operational plan for Fat Tuesday, including increasing the number of assigned officers to more than 350. The revised plan was designed to "deter unlawful activity by providing a strong uniform presence at the event." *See* Declaration of Lou Reiter (Dkt.# 85) ("Reiter Decl."), Ex. 4.[1] At approximately 1 p.m. on Tuesday, Assistant Chief Dan Bryant, the assigned incident commander for the night, and Captain Bill Moffat, the assigned field commander for the night, met to discuss the plan for the evening.

Between 9 and 9:30 p.m., as the crowd steadily increased in size and hostility level, Captain Moffat instructed officers to withdraw from the field to the staging area at the Colman Dock to transition into hardened protective gear. Once the uniformed officers withdrew, the police ordered the plainclothes Anti–Violence Team officers to withdraw from the crowd for their own protection. The commanders moved to the top of the Sunken Ship parking garage at 1st and Yesler Way where they remained for most of the night. When they peered over the top of the garage, they were often pelted with rocks and bottles from the crowd below.

Once a squad had hardened up, it was redeployed to a position on the perimeter of the crowd while other squads withdrew to don protective gear. Asst. Chief Bryant determined that it was not safe to reinsert officers back into the crowd, which had become more dense and confrontational. According to the logs of radio communications, a caller reported around 10 p.m. that he observed several "carloads of gang members" practicing "kick boxing" and fighting moves and heading to Pioneer Square. Reiter Decl., Ex. 9. Officers on the scene also reported observing known

---

**1.** Defendants moved to strike Mr. Reiter's declaration in its entirety. The Court, howev-er, has considered the declaration and its attachments for purposes of this motion.

gang members in the crowd. *Id.,* Ex. 2 at 11.

The crowd swelled to an estimated 5,000 to 7,000 people. Although the commanders were aware that sporadic fights were occurring in the crowd, Asst. Chief Bryant determined that any attempt to disperse the crowd could incite panic or lead to greater violence and injuries. Instead, he attempted to thin the crowd by directing the command post to contact the local bars and request that they close early, which several did.

A marked increase in the violence occurred between midnight and 12:30 a.m. The department's radio communications describe small groups randomly assaulting individuals, and multiple victims in need of medical care.

Despite the continuing violence, police officers were ordered to remain on the periphery of the crowd. The radio communications included the following orders to officers over the course of the night: "evacuate," "move to the perimeter," "keep your backs to the wall," and "no one go in to First and Yesler," where the majority of the crowd was congregated. Reiter Decl., Exs. 6, 13. Officers ordered the crowd to disperse around 1:30 a.m., and when they refused to do so, chemical munitions were deployed. The crowd eventually dispersed.

Plaintiffs were among the scores of individuals who were assaulted during Fat Tuesday. Tragically, one young man, Kristopher Kime, died from injuries he suffered around 1:10 a.m.[2] The plaintiffs in this case were assaulted and injured at various times between 9:45 p.m. and 1:45 a.m. in the Pioneer Square area. *See* Declaration of Michael E. Withey (Dkt.# 84), Ex. 7.

**B. Summary Judgment Standard.**

On a motion for summary judgment, the Court must "view the evidence in the light most favorable to the nonmoving party and determine whether there are any genuine issues of material fact ...." *Holley v. Crank,* 386 F.3d 1248, 1255 (9th Cir.2004). All reasonable inferences supported by the evidence are to be drawn in favor of the nonmoving party. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002). "[I]f a rational trier of fact might resolve the issues in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir.1987).

**C. 42 U.S.C. § 1983 Claim.**

 To state a 42 U.S.C. § 1983 claim, a plaintiff must allege that (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived the plaintiff of a constitutional right. *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988) (as amended in 1990).

**1. The Due Process Clause and Danger Creation Doctrine.**

 In analyzing plaintiffs' Section 1983 claim, the Court must first determine whether they have been deprived of a Constitutional right. Plaintiffs allege that defendants, by failing to intervene in the melee and prevent their injuries, violated their right to substantive due process guaranteed by the Fourteenth Amendment. Generally, "a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.'" *Butera v. Dist. of Colum-*

---

**2.** Mr. Kime's family settled their claims with the City and they are not parties to this action.

*bia,* 235 F.3d 637, 647 (D.C.Cir.2001) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). This general rule arises from the fact that the due process clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *De-Shaney,* 489 U.S. at 197, 109 S.Ct. 998 (explaining that the purpose of the substantive due process clause is to protect the public from oppressive government conduct).

■ There are two exceptions to the general rule that the state does not violate the due process clause by failing to protect individuals from injury at the hands of third parties: the "special relationship" exception, which arises when the State takes a person into custody, and the "danger creation" exception, which arises when the State affirmatively places a person in a more dangerous situation than he or she was in before. *See, e.g., Huffman v. County of Los Angeles,* 147 F.3d 1054, 1058–59 (9th Cir.1998); *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992). Plaintiffs correctly concede that the "special relationship" doctrine does not apply here; they argue that the "danger creation" exception applies.

■ The Ninth Circuit adopted the danger creation exception in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989). In that case, an officer stopped a vehicle in which the plaintiff was a passenger. The officer arrested the driver, impounded the car, and left the passenger stranded in a high-crime area. The passenger subsequently was raped. The court allowed her claim

against the officer to proceed because a jury could have found that the officer "affirmatively placed the plaintiff in a position of danger." *Wood,* 879 F.2d at 589–90. Following the holding in *Wood,* the Ninth Circuit applied the danger creation exception in *Grubbs,* where correctional officers affirmatively created the risk of harm to the plaintiff by knowingly assigning her to work alone in the medical clinic with a man despite their knowledge of the man's "extraordinary history of unrepentant violence against women and girls [and that he] was likely to assault a female if left alone with her;" the known offender later raped plaintiff. *Grubbs,* 974 F.2d at 121. Following these and subsequent cases in the Ninth Circuit, the danger creation exception applies if (1) the police affirmatively place plaintiff in a position that was more dangerous than the one in which they found him or her, and (2) the police act with deliberate indifference to a known or obvious danger in subjecting plaintiff to the condition. *Id.* at 900; *see also Estate of Amos v. City of Page,* 257 F.3d 1086, 1091 (9th Cir.2001) ("common to our cases recognizing a cognizable section 1983 claim under the 'danger creation' exception, is an *affirmative act* by the police that leaves the plaintiff in a more dangerous position than the one in which they found him") (emphasis in original).

## 2. Affirmative Conduct Placing Plaintiffs in a More Dangerous Position.

In denying defendants' motion to dismiss, the Court noted that "plaintiffs allege that Defendants' affirmative and announced policy of non-intervention in ongoing violence placed Plaintiffs in danger and exacerbated the risk of violence from third parties." The Court found this allegation sufficient to allow the Section 1983 claim to proceed. *See* Dkt. # 38 (citing *Dwares v. City of New*

*York*, 985 F.2d 94, 99 (2d Cir.1993) (denying motion to dismiss where police informed "skinheads" in advance that they would not intervene in any violence at a flag-burning rally unless the "skinheads" got totally out of control)). In response to defendants' motion for summary judgment, plaintiffs have abandoned their "announced policy" theory, apparently due to a lack of supporting evidence. Plaintiffs now contend that defendants placed them in a more dangerous position by discarding the operational plan for Fat Tuesday, which called for high police visibility and aggressive crowd control tactics, and instead pursuing a strategy of non-intervention and withdrawal of police presence.

■ The denial of police protection, or even the withdrawal of protection, cannot form the basis of a Section 1983 claim because mere inaction does not constitute the necessary affirmative action.[3] *See, e.g., DeMaria v. Washington County*, 12 F.Supp.2d 1093, 1099 (D.Id.1996) (holding

that even though police ignored a family's pleas for help when they were threatened and harassed by their neighbors, defendants' "passivity is not the affirmative creation of a dangerous situation required by the case law"). Plaintiffs argue that their situation involves more than mere inaction because the police department abandoned a more effective operational plan in favor of a plan of inaction and the ultimate harm that befell plaintiffs was a foreseeable result of that decision. Plaintiffs' argument, however, incorrectly concludes that the promulgation of a policy plus a foreseeable harm is a due process violation.[4] The case law does not support this conclusion. *See, e.g., Huffman*, 147 F.3d at 1059–60 (finding no constitutional violation where off-duty officer shot and killed patron in a bar fight, even though county policy required off-duty officers to carry firearms). For example, in *Amos v. City of Page*, the decedent was injured in a car accident, wandered off into the desert, and ultimately died. 257 F.3d at 1089–90. The officers

---

**3.** An exception to this rule exists if state actors cut off independent sources of aid then fail to render assistance. *See, e.g., Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir. 1988) ("When a state cuts off sources of private aid, it must provide replacement protection"). In *Archie*, a woman called the fire department and requested aid for her friend who was having trouble breathing. The emergency operator did not send an ambulance, advised the woman to breathe into a paper bag, then gave the same advice when the friend called a second time. The woman later died of respiratory failure, but the court found that the city was not liable for failure to provide rescue services. *Id.; compare Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) (finding a constitutional violation where state functionaries prohibited private actors from rescuing drowning boy). Plaintiffs do not argue that defendants prevented them from receiving private aid.

**4.** The parties have cited, and the Court has found, only one published case implying that a policy of police restraint which increases

the likelihood of harm by private parties is sufficient to state a cause of action under the due process clause. In *Rosenbaum v. City of New York*, members of the Hasidic Jewish community sued the City after they were injured during the Crown Heights riots. 975 F.Supp. 206 (E.D.N.Y.1997). The court allowed their claim to proceed. The *Rosenbaum* court appears to have relied on *Dwares* without acknowledging a key difference between the cases. In *Dwares*, the police gave the "skinheads" "prior assurances" of non-intervention; no such assurances were given in *Rosenbaum*. *Dwares*, 985 F.2d at 99. To the extent that *Rosenbaum* can be read to hold that a policy of restraint in itself can give rise to a due process violation, it is inconsistent with Ninth Circuit case law and the Court declines to follow it. To the extent that the *Rosenbaum* holding relied on the fact that police ignored direct pleas for assistance and directly encouraged two of the victims into a dangerous area with assurances of safety, it is consistent with Ninth Circuit case law and this opinion.

halted civilian search efforts and conducted only a brief search themselves, despite finding blood in the victim's car and evidence of a person stumbling and wandering in circles. The officers were following a standard department practice of not conducting thorough searches in the area. Rather than focusing on the existence of the department's standard practice or the fact that the officers acted pursuant to it, the court considered whether the state actors placed the victim in a more dangerous position. The court upheld dismissal of the civil rights claim, noting that the victim was in great danger before the officers appeared, any increased danger was "extremely speculative," and the victim was deprived only of "competent rescue services," which the constitution does not guarantee. *Id.* at 1091. In this case, as in *Amos*, even if the police department's efforts were incompetent and the ultimate harm was foreseeable, those facts alone do not give rise to a constitutional violation.

In support of their argument that the state's facilitation of a foreseeable harm is sufficient to state a due process violation, plaintiffs rely heavily on *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir.1997). The *Morse* case was brought by the estate of a teacher murdered in a classroom by an individual with a history of mental illness. State actors left open a back door to the school, through which the killer entered the building. Plaintiffs quote the following statement from the *Morse* decision, "The dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or omission." *See* Plaintiffs' Opposition at 10, n.5 (quoting *Morse,* 132 F.3d at 910). The *Morse* decision, however, explained that foreseeability was only part of the first prong of a four part test; the first prong was whether "the harm ultimately caused was foreseeable *and fairly direct." Morse,* 132 F.3d at 908 (emphasis added). Although the state functionaries left the victim in a more vulnerable position by leaving the school unlocked, and the ultimate harm was foreseeable, the *Morse* court upheld the dismissal of the case because the state actors did not "directly place[ ] the victim in harm's way." *Id.* at 915–16. As *Morse* shows, merely facilitating a foreseeable harm is not enough to state a due process violation.

Requiring that the police conduct result fairly directly in the ultimate harm to the victim is consistent with Supreme Court and Ninth Circuit precedent.[5] The Ninth Circuit has found a due process violation only in cases in which there was evidence that defendant had contact with the victim and/or assailant, and that contact directly placed the victim in harm's way. *See, e.g., Wood,* 879 F.2d at 588 (stopping a vehicle in which the plaintiff was a passenger, arresting the driver, impounding the car, and leaving the passenger stranded in a high-crime area; plaintiff was raped); *Grubbs,* 974 F.2d at 121 (knowingly assigning plaintiff to work alone with a man despite his repeated history of violence against women and girls; plaintiff was raped); *Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082, 1086–87 (9th Cir. 2000) (officers ejected victim from a bar late at night, prevented him from driving his truck or reentering the bar, watched him walk away from nearby establish-

---

**5.** This Court is bound to follow Supreme Court and Ninth Circuit precedent under the principle of *stare decisis. See, e.g., Hart v. Massanari,* 266 F.3d 1155, 1168, 1175 (9th Cir.2001) (explaining that court decisions are "binding" on other courts at the same level and lower; the practice of following precedent promotes predictability and consistency in the judiciary).

ments wearing only a t-shirt; victim died of hypothermia in sub-freezing temperatures); *Penilla v. City of Huntington Park,* 115 F.3d 707 (9th Cir.1997) (police responded to a 911 call, found Penilla in urgent need of medical care, canceled the request for paramedics, moved him inside his house, locked the door, and left); *see also DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 (finding no due process violation even though it was certainly foreseeable that the abusive father would harm his son once the state allowed him to regain custody, and the state indirectly facilitated the abuse by returning the boy to his father). In sharp contrast, defendants in this case did not place plaintiffs in harm's way. There is no evidence that defendants had any contact with plaintiffs or their assailants, nor did they compel them to interact in any way. As in the *DeShaney* case, "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *DeShaney,* 489 U.S. at 203, 109 S.Ct. 998 (upholding dismissal because victim was "in no worse position than that in which he would have been had [state functionaries] not acted at all").

As defense counsel stated during oral argument, "There isn't a person who is pleased with how [Fat Tuesday] came out." Indeed, after considering the events of Fat Tuesday, including reports of the on-going and escalating violence, one is inevitably left wishing the police had stepped in sooner. With a full picture of what transpired, it is easy to imagine alternate, and better, courses of conduct. The police in the midst of the emergent and fluid situation, however, did not have the luxury of complete information or unlimited time to consider the possibilities. Rather, they were forced to make immediate choices between two very unappealing options: disperse the crowd early and risk inciting further violence and/or panic, or wait to see if the crowd thinned and calmed on its own. Although hindsight shows that the decision not to intervene sooner was wrong, it is impossible to know what might have transpired had other courses of conduct been chosen.[6] Moreover, the constitution does not require the police to make the correct decision at all times, especially in highly volatile and fluid situations such as these. A contrary holding would hold municipalities, and their employees, to an impossibly high standard and expose them to expensive litigation in a potentially unlimited number of situations. In light of these realities and applicable precedent, the Court is unwilling to expand the danger creation exception to apply in this case.[7]

Accordingly, plaintiffs' Section 1983 claim fails as a matter of law because they have not shown a predicate violation of

---

6. Plaintiffs' expert, Lou Reiter, opined that the police department's inaction incited the assailants to greater violence. This "embolden the criminals" theory has been rejected. *See, e.g., DeMaria,* 12 F.Supp.2d at 1099–1100 ("In every case where an officer stands by and does nothing, a claim could be raised that the officer's inaction emboldened the criminal. But *DeShaney* has clearly foreclosed these claims."). Even if this legal theory were viable, plaintiffs have not presented any evidence, such as statements from the assailants, to support their claim that the assailants were emboldened by the officers' actions or inaction.

7. This Court, like others which have considered the due process clause, is reluctant to expand the scope of substantive due process beyond its intended purpose, which is to prevent government power arbitrarily and oppressively exercised because, as Chief Justice Marshall stated, " 'we must never forget, that it is *a constitution* we are expounding.' " *Daniels v. Williams,* 474 U.S. 327, 331, 88 L.Ed.2d 662 (1986) (quoting *McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819)).

their constitutional rights. In light of this holding, the Court need not decide the issues of deliberate indifference or qualified immunity.

## D. Negligence Claim.

■ Dismissal of plaintiffs' 42 U.S.C. § 1983 claims eliminates the only claims for which this Court possessed original jurisdiction. When all claims for which a federal court possessed original jurisdiction are eliminated, "the balance of factors will weigh toward remanding any remaining pendent state claims to state court." *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir.1991); *see also* 28 U.S.C. § 1367(c)(3) (permitting court to decline to exercise supplemental jurisdiction when all claims for which court possessed original jurisdiction are dismissed). However, where substantial judicial resources have already been committed and remanding would cause a duplication of effort, the district court may properly retain jurisdiction over state law claims. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 994–95 (9th Cir.1991).

■ The Court finds that substantial judicial resources have been committed to this dispute and that remanding the matter would cause a duplication of efforts. The Court therefore retains supplemental jurisdiction over plaintiffs' remaining state law claim for negligence.

■ A plaintiff asserting a negligence claim must show that (1) the defendant owed the plaintiff a duty, (2) the defendant breached the duty, and (3) the breach proximately caused plaintiff's damages. *See Laurelon Terrace v. City of Seattle*, 40 Wash.2d 883, 891, 246 P.2d 1113 (1952). "Under the public duty doctrine, there is no liability for a public official's negligent conduct unless it is shown that the duty breached was owed to the injured person as an individual and not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one)." *Torres v. City of Anacortes*, 97 Wash.App. 64, 73, 981 P.2d 891 (1999). The four exceptions to the public duty doctrine are (1) the special relationship exception, (2) the failure to enforce exception, (3) the legislative intent exception, and (4) the rescue doctrine. *Bailey v. Town of Forks*, 108 Wash.2d 262, 268, 737 P.2d 1257 (1987). Plaintiffs argue that the state courts have hinted that additional exceptions might exist; however, plaintiffs neither articulate those possible exceptions nor show their applicability.

■ Plaintiffs did not defend their negligence claim in response to defendants' motion for summary judgment. However, plaintiffs' counsel stated during oral argument that they did not intend to concede the claim. During oral argument, plaintiffs did not argue that any of the exceptions to the public duty doctrine apply, nor have they provided any evidence to support any of the exceptions. Instead, plaintiffs argued that the public duty doctrine itself does not apply. In support of this argument, plaintiffs noted that the Court's order denying defendants' motion to dismiss the negligence claim found the doctrine "inapplicable" to the facts alleged. (Dkt.# 43). Plaintiffs' read the Court's prior order too broadly. The Court based its statement on the fact that plaintiffs alleged that defendants announced a policy of non-intervention and therefore breached their duty to refrain from placing specific individuals at an unreasonable risk of harm. The Court found that those allegations were sufficient to withstand the Rule 12(b)(6) motion to dismiss. However, plaintiffs' burden is higher at the summary judgment stage. As set forth above, they have not shown that defendants announced a policy of non-intervention.

Plaintiffs also argued that pursuant to *Osborn v. Mason County*, a duty was owed

to these particular plaintiffs. 122 Wash. App. 823, 95 P.3d 1257 (2004). *Osborn* did not hold, as plaintiffs allege, that the public duty doctrine is inapplicable every time there is a limited class of potential plaintiffs. Indeed, accepting that argument would render the doctrine meaningless. Rather, *Osborn* applied the rescue doctrine exception, and held that under that exception, "all that is required for a plaintiff to assert a claim ... is that an actor who, having undertaken to render aid to plaintiffs, increased the risk of harm to the plaintiffs through his or her negligent acts." *Id.* at 835, 95 P.3d 1257 (internal citation and quotation omitted). Plaintiffs have not shown that the rescue doctrine applies because their entire cause of action is based on the allegation that defendants *failed* to render aid. Moreover, in *Osborn*, state officials affirmatively prevented a private citizen from rendering aid. In this case, plaintiffs do not allege, nor is there any evidence to show, that the state actors interfered with any private sources of aid. Accordingly, the public duty doctrine bars plaintiffs' negligence claim.

## III. CONCLUSION

Plaintiffs present compelling arguments in both their memoranda and their oral argument in favor of extending the law to cover the serious harms they suffered. At the end of the day, however, it was not the police, but rather private assailants who inflicted those harms upon them. Although the injuries that occurred on Fat Tuesday are tragic, the state of the law in this circuit and this state simply does not impose liability on the City, the Chief of Police, and the former Mayor in these circumstances.

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment (Dkt.# 64). The Clerk of the Court is directed to enter judgment in defendants' favor and against plaintiffs.