**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EMMA MARY ELLEN HOLLEY; DAVID
HOLLEY; MICHAEL HOLLEY, a
minor; BROOKS BAUER, individually
and on behalf of the general
public,
                  *Plaintiffs-Appellants,*

                  v.

GROVE S. CRANK, SR., individually
dba Triad Realtors; TRIAD INC.,
individually dba Triad Realtors,
                  *Defendants,*

                  and

DAVID MEYER, individually and in
his capacity as President and
designated officer/broker of Triad,
Inc., dba Triad Realtors,
                  *Defendant-Appellee.*

No. 99-56611

D.C. No.
CV-97-08368-
WMB-SHX
CV-98-07965-
WMB-SHX

AMENDED
OPINION

On Remand from the United States Supreme Court

Filed October 26, 2004
Amended March 7, 2005

Before: Procter Hug, Jr., Betty B. Fletcher, Circuit Judges,
and Susan Y. Illston,* District Judge.

Opinion by Judge Hug

*The Honorable Susan Y. Illston, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

Elizabeth N. Brancart, Brancart & Brancart, Pescadero, California, for the plaintiffs-appellants.

Douglas G. Benedon, Benedon & Serlin, Woodland Hills, California, for the defendant-appellee.

## OPINION

HUG, Circuit Judge:

In *Meyer v. Holley*, 537 U.S. 280 (2003), the Supreme Court vacated this Court's opinion in *Holley v. Meyer*, 258 F.3d 1127 (9th Cir. 2001) and remanded for further proceedings. In revisiting this case, we address two distinct questions which the Supreme Court has left for us to decide. First, whether as the designated officer/broker of Triad, Inc., David Meyer can be held personally liable for the actions of Triad's employee Grove Crank. Second, whether David Meyer can be held liable through the piercing of Triad's corporate veil. We remand to the district court for further proceedings.

## I.   Background

Emma Mary Ellen Holley is African American, her husband, David Holley, is Caucasian and their son, Michael Holley, is African American. The Holleys allege that in October 1996, they visited Triad Realty's office in Twenty-Nine Palms, California where they met with Triad agent Grove Crank and inquired about listings for new houses in the range

of $100,000 to $150,000. The Holleys allege that Crank showed them four houses in the area, all priced above $150,000. In mid-November 1996, the Holleys located a home on their own that happened to be listed by Triad. In response to the Holleys' inquiry about the home, Triad agent Terry Stump informed them that the asking price for the house was $145,000. The Holleys expressed interest in purchasing the home and offered to pay the asking price and to put $5,000 in escrow for the builder to hold the house until April or May 1997 when they closed escrow on the sale of their existing home.

Stump told the Holleys that their offer seemed fair, as did the builder, Brooks Bauer, when Mrs. Holley called him with the same offer. Bauer did express, however, that the offer would have to go through Triad. Later, Stump called Mrs. Holley to tell her that more experienced agents in the office, one of whom was later identified as Grove Crank, felt that $5,000 was insufficient to get the builder to hold the house for six months. The Holleys decided not to raise their offer, and Triad never presented the original offer to Bauer. One week later, Bauer inquired at Triad about the status of the Holleys' offer. Crank then allegedly used racial invectives in referring to the Holleys, telling Bauer that he did not want to deal with those "n ——" and calling them a "salt and pepper team." The Holleys eventually hired a builder to construct a house for them, and Bauer later sold his house for approximately $20,000 less than the Holleys had offered.

Bauer and the Holleys filed a complaint on November 14, 1997, alleging that Crank and Triad violated federal and state fair housing laws. They later filed a separate action against David Meyer as officer/broker, president and owner of Triad, making the same allegations and adding several new claims. The district court consolidated the two cases. The district judge, ruling on a Federal Rule of Civil Procedure 12(b)(6) motion, dismissed all of the claims except the Fair Housing Act (FHA) claim, on the grounds that they were barred by the

applicable statutes of limitation. Plaintiffs have not appealed this ruling. With regard to the FHA claim, the district court granted the motion to dismiss Meyer in his capacity as an officer of Triad. The district court thereafter granted summary judgment in favor of Meyer on the claim that Meyer was vicariously liable as the designated officer/broker of Triad. It then entered a final order that "judgment be granted for David Meyer on all remaining claims in this action." Plaintiffs appealed from the final judgment.

We reversed the judgment of the district court, applying a vicarious liability analysis provided in HUD regulation 24 C.F.R. § 103.20(b) (1999) (since repealed). Further, we followed our own prior precedent and that of three other circuits holding that the duty to obey the laws relating to racial discrimination under the FHA is non-delegable. *See Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1980), *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992), *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1096-98 (7th Cir. 1992), *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir. 1974).

The Supreme Court disagreed, holding that the FHA is governed by traditional vicarious liability rules and tort principles and that the FHA did not create a non-delegable duty not to discriminate based on race. Thus, the Supreme Court held that we erred in holding that Meyer could be held liable as the sole owner and president of Triad based upon an FHA-derived non-delegable duty. The Supreme Court also held that we erred in holding that Meyer could be held liable as the designated officer/broker of Triad based *solely* upon his right to control Crank.

Although the Supreme Court found the "right to control" by the designated officer/broker insufficient by itself under traditional agency principles to establish a principal/agent relationship, it left the application of traditional vicarious liability rules to this court, stating:

The Ninth Circuit did not decide whether *other* aspects of the California broker relationship, when added to the "right to control," would, under traditional legal principles and consistent with "the general common law of agency," establish the necessary relationship. But in the absence of consideration of that matter by the Court of Appeals, we shall not consider it.

*Meyer*, 537 U.S. at 291 (citation omitted) (emphasis in original). The Supreme Court also declined to consider whether traditional corporate-veil piercing principles should apply in this case, stating:

[W]hen traditional vicarious liability principles impose liability upon a corporation, the corporation's liability may be imputed to the corporation's owner in an appropriate case through a "piercing of the corporate veil." The Court of Appeals, however, did not decide the application of "veil piercing" in this matter either. It falls outside the scope of the question presented on certiorari. And we shall not here consider it.

*Id.* at 292 (citations omitted). The Court vacated our judgment and remanded for further proceedings consistent with its opinion.

## II.  Vicarious Liability

### A.  Preservation of the Vicarious Liability Claims

Defendants argue that the Holleys failed to preserve their claim that Meyer may be liable under traditional principles of vicarious liability. However, we find that the Holleys raised the issue in their opening brief when they argued that Meyer's liability turned on HUD regulation 24 C.F.R. § 103.20(b). At the outset, we note that we read opening briefs liberally. *See*

*People of Guam v. Reyes*, 879 F.2d 646, 648 (9th Cir. 1989) (citing *Fed. Sav. and Loan Ins. Co. v. Haralson*, 813 F.2d 370, 373-74 n.3 (11th Cir. 1987)). Because the Supreme Court held that the HUD regulations mean that traditional rules of vicarious liability apply, *see Meyer*, 537 U.S. at 286-87, we construe the opening brief's discussion of the HUD regulations as adequately raising, and thereby preserving, the traditional vicarious liability claims.

## B. Designated Officer/Broker

[1] Under general principles of corporate liability, a corporate employee acts on behalf of the corporation, not its owner or officer; as a result, liability in the typical employment relationship runs between the corporation and the salesperson and between the corporation and the supervisor, but not between the salesperson and the supervisor. *See Meyer*, 537 U.S. at 286. Here, however, the real estate corporation and employment relationship at issue are atypical because California law makes the designated real estate broker of a real estate corporation personally responsible for the supervision of the corporation's salespersons. Because Meyer remained Triad's designated real estate broker, he remained personally responsible for the supervision of the corporations's salespersons. When Meyer delegated this responsibility to Crank, he created an agency relationship between himself and Crank, which made Meyer vicariously liable as the principal for the discriminatory actions of Crank as his agent.

[2] Meyer has been the sole owner and officer/broker of Triad, a small real estate agency since 1978. In California, as in most states, the real estate profession is highly regulated.

> It is unlawful for any person to engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this state without first obtaining a real estate license from the department.

Cal. Bus. & Prof. Code § 10130. In California, a corporation may hold a real estate broker's license, but only if it designates an officer who is qualified to hold a broker's license to serve as officer/broker of the corporation. Cal. Bus. & Prof. Code §§ 10158 and 10211. A California corporate real estate broker operates "only through and because of" the license of its designated officer. *Amvest Mortgage Corp. v. Antt*, 58 Cal. App. 4th 1239, 1243 (1997). "No acts for which a real estate license is required may be performed for, or in the name of, a corporation when there is no designated" corporate officer/ broker. Cal. Code Regs. Title X, § 2740; *see also Amvest Mortgage Corp.*, 58 Cal. App. 4th at 1243. In this case Triad held a corporate real estate broker's license and Meyer was licensed as its designated officer/broker. Meyer was the only such broker affiliated with Triad. Crank and the other Triad agents were salesmen not brokers.

The statute provides that the officer/broker designated by a corporate broker licensee

> shall be responsible for the supervision and control of the activities conducted on behalf of the corporation by its officers and employees as necessary to secure full compliance with the provisions of this division, including the supervision of salespersons licensed to the corporation in the performance of acts for which a real estate license is required.

Cal. Bus. & Prof. Code § 10159.2(a). Among the officer/ broker's obligations for supervision is "the establishment of policies, rules, procedures and systems to review, oversee, inspect and manage . . . [f]amiliarizing salespersons with the requirements of federal and state laws relating to the prohibition of discrimination." Cal. Code Regs. Title X, § 2725. For a corporate real estate broker to operate lawfully, it must "conduct[ ] its brokerage business if at all under the active aegis of its designated broker." *Milner v. Fox*, 102 Cal. App. 3d 567, 575 (1980). The designated officer/broker, not the

corporate entity itself, is charged with the responsibility to assure corporate compliance with the real estate law. *Norman v. Dep't. of Real Estate*, 93 Cal. App. 3d 768, 776-77 (1979) ("Such a real estate broker must reasonably be charged with responsibility for the corporate compliance with the Real Estate Law, for otherwise with no such fixed responsibility, the statutory purpose would be frustrated." (internal citation omitted)).

The conclusion that the designated officer/broker is personally responsible for supervising the salesperson's compliance with the law is supported by the legislative history of the Business and Professions Code § 10159.2. The staff analysis for the Senate Committee on Business and Professions, which related the background and purpose of the proposed enactment of that section in 1979 stated:

> *BACKGROUND*: The Business and Professions Code stipulates that a person or persons applying for a corporate license to practice real estate must designate in the application an officer of the proposed corporation who holds a valid real estate broker's license. That person becomes the "designated officer" of the corporation. The purpose of this provision is to provide the public, in its dealings with real estate corporations, the same licensing protections afforded it in dealing with non-corporate real estate concerns.

> As currently worded, however, there is no stipulation in the law as to the designated officer's control or supervisory responsibilities over the corporation. . . .

> *PROPOSED LEGISLATION*: AB 985 stipulates that the designated officer named on the corporate license application assumes responsibility for the officer's, employee's and salesperson's compliance with the provisions of the Real Estate Law. . . .

*COMMENTS*: AB 985 attempts to insure licensed supervision of real estate corporation activity by holding designated officers personally responsible for that supervision.

*Cal. Bus. & Prof. Code § 10159.2: Hearings on AB 985 before the Senate Committee on Business and Professions* (July 11, 1979).

The Assembly Committee on Labor, Employment and Consumer Affairs related similar objectives of the proposed legislation:

> The only way that the active participation of the licensed individual may be ensured is by "piercing the corporate veil" and making the individual licensee vulnerable to action on account of corporate misdeeds, or on account of failure to fulfill corporate responsibilities. . . . The granting of the corporate license is predicated upon the qualifications of the designated officer in the first place. It is no injustice to demand that the person standing for the corporation at licensing continue to stand for the corporation. That is an implicit assumption of the law anyway.

*Cal. Bus. & Prof. Code § 10159.2: Hearings on AB 985 before the Assembly Committee on Labor, Employment and Consumer Affairs* (April 24, 1979).

The supporting analysis of the Department of Real Estate stated succinctly the reasons for the proposal:

> *REASONS FOR PROPOSAL*
>
> 1. The real estate law places the responsibility for supervision of salespersons and employees upon a real estate broker. Even though a corporate

real estate licensee is itself a broker, the corporate entity is not as qualified as a natural person to exercise the supervision necessary to insure public protection.

2.  Lack of active supervision by a designated officer has resulted in abuses and injury.

3.  Since a corporate license is issued based upon the qualifications, experience and good character of the designated officer, that officer should continue to take an active role in the conduct of corporate real estate acts.

*Cal. Bus. & Prof. Code § 10159.2: Hearings on AB 985 before the Department of Real Estate R-15.*

**[3]** The statutory provisions regulating the real estate profession, particularly after the 1979 amendment with its legislative history, places a direct, personal responsibility on the designated officer/broker of a real estate corporation to supervise the salespersons to assure compliance with the state and federal laws. This personal obligation is independent from that of the normal responsibilities of a corporate officer or of the corporation itself. This is a direct personal responsibility on the part of the officer/broker that is subject to disciplinary action affecting that officer/broker's personal broker's license.

## C.  Crank as an Agent of Meyer in Fulfilling his Officer/Broker Obligation Under California Law

**[4]** Generally, for an agency relationship to exist, a principal must consent to the agent acting on his behalf and subject to his control, and the agent must consent to act for the principal. *See* Restatement (2d) of Agency § 1. Principals are liable for the torts of their agents committed within the scope of their agency. Here, there is sufficient evidence that Meyer and

Crank consented to an agency relationship when Meyer delegated his personal duty as an officer/broker to Crank to overcome the summary judgment.

We review a grant of summary judgment de novo. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and determine whether there are any genuine issues of material fact and whether the district court has correctly applied the relevant substantive law. *Id.* "[I]f a rational trier of fact might resolve the issues in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In this case, viewing the evidence in the light most favorable to the plaintiffs, we conclude that Meyer intended to turn the real estate business over to Crank so that Meyer could pursue another career. Crank was not a licensed real estate broker, and thus would have been unable to continue with the corporation without a licensed real estate broker as the designated officer/broker. Therefore, it was agreed that Meyer would remain Triad's designated officer/broker until Crank got his own broker's license. Meyer understood that by remaining Triad's designated officer/broker he continued to have personal responsibilities under California law. He understood that he had the personal duty to make sure "that our agents were acting lawfully, that the standards of the Department of Real Estate are upheld, that the contracts were reviewed (and) that people were treated fairly." (ER 199.) Meyer agreed to delegate those responsibilities to Crank so that Crank could continue to run Triad as a real estate brokerage. There is evidence that both Meyer and Crank understood Meyer's personal responsibility as the designated officer/broker and that Crank agreed to carry out this duty on behalf of Meyer subject to Meyer's ultimate control. This is the only manner in which the Triad Corporation could have continued to operate as a real estate business. There is therefore evi-

2834 HOLLEY v. MEYER

dence of an agreement to delegate this personal duty as an officer/broker, to be filled on a day to day basis by Crank, to assure that state and federal laws were being observed in the operation of Triad's real estate business.

**[5]** The Holleys also contend that Crank acted within the scope of his agency when he committed the act of discrimination. They are correct. The alleged discrimination occurred when Crank was supervising another Triad agent, Terry Stump. Such supervision was Meyer's duty under California law and therefore was within the scope of the duty he delegated to Crank. There was thus evidence under the general common law of agency that Meyer had a personal duty as officer/broker to supervise the salesmen so as to assure compliance with federal and state law, that this duty was delegated to Crank to carry out, and that Crank's actions with regard to the alleged discrimination against the Holleys were within the scope of his agency and sufficient to impose liability on Meyer as the principal for the failure of his agent Crank to fulfill the duties of officer/broker.

## III. Meyer's Liability as Owner of Triad

In addition to imposing liability on the basis of the traditional vicarious liability principles discussed above, we must consider whether this is an appropriate case in which to impose liability on Meyer by piercing the corporate veil. Although the Supreme Court did not reach this issue, the Court specifically stated that we are free to consider whether liability may be imputed to the sole owner of Triad on that basis. *Meyer*, 537 U.S. at 292. The district court resolved the issue of whether Meyer could be held liable under an agency theory as the officer/broker of Triad by means of a summary judgment. All of the remaining claims were dismissed under Fed. R. Civ. P. 12(b)(6).

> We review de novo a district court's dismissal of an action for failure to state a claim under Fed.R.Civ.P.

12(b)(6). A Rule 12(b)(6) dismissal motion "can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim." We liberally construe civil rights complaints.

*Gobel v. Maricopa County*, 867 F.2d 1201, 1203 (9th Cir. 1989) (citations omitted). We stated in *Gilligan v. Jamcor Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) that "the Court has stated that the FHA must be given a 'generous construction' to carry out a 'policy that Congress considered to be of the highest priority.' " (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 211-12 (1972)).

Defendants contend that this issue was waived because it was not properly advanced in the district court or in this court. In the district court, plaintiffs alleged that Meyer was liable based upon his wide ranging control of Triad as its sole owner in addition to being its president and designated officer/ broker. Plaintiffs also alleged that Triad paid its taxes under Meyer's tax identification number not the corporation's.

> When substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on the grounds of equity and fairness, courts have been willing to apply the "alter ego" or instrumentality theory in order to cast aside the corporate shield and to fasten liability on the individual shareholder.

1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corps.*, § 41.35 at 666-668 (perm. ed., rev. vol. 2004). The allegation that Meyer was Triad's sole shareholder at the time of the alleged violation under FHA, his status as Triad's president and designated officer/broker, and the failure to treat the corporation as a distinct entity in his tax return support an inference that he exercised pervasive control over the

corporation's affairs. The district court had evidence that the corporation was very thinly capitalized, which is a relevant factor in applying an alter ego theory. *See Anderson v. Abbott*, 321 U.S. 349, 362 (1944). There was also evidence that in the alleged transfer of Triad to Crank no corporate formalities were followed, giving further evidence that Meyer did not view the corporation as an entity distinct from himself. With regard to the equity and fairness of the corporate shield to liability, the evidence before the district court revealed that Triad did not have assets to pay a judgment and that Triad's insurance policy excluded liability for discrimination in the provision of service.

The dismissal of plaintiffs' claims under Fed. R. Civ. P. 12(b)(6) were with prejudice without any opportunity to amend the complaint. At the very least the allegations in the complaint and the additional material produced in the court proceedings justified allowing the plaintiffs to amend their complaint to specifically allege the piercing of the corporate veil theory. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment."); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1108 (9th Cir. 2003) (stating that dismissals under Rule 12(b)(6) and Rule 9(b) "should ordinarily be without prejudice").

Before this court the plaintiffs raised the issue, although briefly, in arguing that Meyer was potentially liable under the FHA in his capacity as sole shareholder of Triad. The plaintiffs asserted that their evidence would show that Meyer is the sole shareholder of Triad, and thus an argument to pierce the corporate veil would be meritorious. We conclude that the plaintiffs have not waived this argument either in the district court or in the court of appeals, especially in light of the fact

that the plaintiffs were not given an opportunity to amend their complaint before the dismissal.[1]

**[6]** We remand this issue to the district court to permit an amendment of the complaint to specifically advance the theory that Meyer, as the sole shareholder of Triad, is liable under the piercing of the corporate veil theory for the alleged violation of plaintiffs' rights under FHA. One of the issues in contention is whether Meyer was in fact the sole owner at the time of the alleged events. Resolving this issue would involve determining whether the proposed transfer of Triad to Crank had been accomplished at that time.

## IV.   Conclusion

We reverse and remand this case to the district court for further proceedings consistent with this opinion on the issues of Meyer's liability as principal for the actions of his agent, Crank; and Meyer's liability based upon piercing the corporate veil.

**REVERSED AND REMANDED.**

---

[1]Before the Supreme Court, the United States, as *amicus curiae*, argued that plaintiffs had not waived the issue of piercing the corporate veil. The brief made the point that although sole ownership of a corporation does not in itself warrant piercing the corporate veil, it does weaken the economic reasons for limited liability for sole corporate shareholder, and when combined with other factors, justifies piercing the corporate veil.