[No. B232571. Second Dist., Div. Seven. June 18, 2012.]

BERNARD SANDLER, as Cotrustee, etc., et al., Plaintiffs and Appellants,
v.
CARLOS MANUEL SANCHEZ, Defendant and Respondent.

## COUNSEL

Steven W. Kerekes for Plaintiffs and Appellants.

Robert A. Lisnow for Defendant and Respondent.

June Babiracki Barlow, Neil D. Kalin and Jenny Y. Li for California Association of Realtors as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**PERLUSS, P. J.**—Business and Professions Code section 10159.2[1] makes a licensed individual real estate broker who is the designated officer of a corporate broker "responsible for the supervision and control" of the corporate broker's employees. Can a designated officer's failure to supervise a corporate employee, without more, subject the officer to direct personal liability to third parties for harm caused by his or her failure to supervise? Apart from the officer's direct liability, can the designated officer be held vicariously liable under traditional agency principles for the tortious conduct of the corporate employees he or she is responsible for supervising?

The designated officer's duty to supervise codified in section 10159.2 is owed to the corporation, not to third parties. Accordingly, breach of that statute is grounds for administrative discipline against the designated officer by the licensing entity and perhaps an action by the corporation for indemnification, but not an action by third parties. Moreover, whether or not a designated officer may be, under traditional agency principles, vicariously liable for the tortious conduct of the employees he or she supervises in an appropriate circumstance, those circumstances are not, and cannot, be alleged

---

[1] Statutory references are to the Business and Professions Code unless otherwise indicated.

here. Accordingly, we affirm the trial court's dismissal of this action against the designated officer of a real estate brokerage corporation after the trial court sustained without leave to amend his demurrer to the complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Complaint*

Bernard Sandler and Linda Marie Sandler, as trustees of the Bernard Sandler and Linda Marie Sandler Revocable Intervivos Family Trust dated September 13, 1991, their adult daughter, Stacy Sandler, and Steven K. Ridgeway (collectively the Sandler parties), sued 765 South Windsor, LLC (South Windsor), Gold Coast Financial (Gold Coast), a real estate brokerage corporation, and Carlos Sanchez, Gold Coast's designated officer/broker. According to the allegations in the operative third amended complaint, Keith Desser, a real estate salesman, president and sole shareholder of Gold Coast and a principal of South Windsor, solicited the Sandler parties to loan $600,000 to South Windsor to finance improvements to an eight-unit apartment building for the purpose of converting the units to condominiums. Desser represented that, once the improvements were made and the condominium conversion completed, the property would be worth in excess of $5.5 million, more than enough, even with a first deed of trust of $2.75 million held by another lender, to secure the Sandler parties' loan. Desser, however, did not reveal $600,000 was woefully insufficient to finance the necessary repairs for the condominium conversion; the property did not have sufficient equity to provide collateral for a second trust deed securing the note; and the primary lender had refused to extend the first note, which was imminently due, resulting in foreclosure by the holder of the first trust deed and leaving the Sandler parties' note unsecured. In addition, Desser used $300,000 of the loan proceeds, which he obtained by amending the escrow instructions, for his personal expenses.

The complaint asserts a cause of action for breach of fiduciary duty against Sanchez.[2] Although the complaint does not allege Sanchez played any role in the transaction, or even knew of it, the Sandler parties allege he, as Gold Coast's designated officer, owed them a duty in accordance with section 10159.2 to supervise Gold Coast's employees, including Desser. Had Sanchez fulfilled his duty to supervise, he would have learned about Desser's material misrepresentations and either disclosed them to the Sandler parties or cancelled the loan transaction. Finally, the complaint alleges Desser was

---

[2] The complaint also asserts causes of action for breach of contract and fraud against Gold Coast and South Windsor. Desser, who was not named as a defendant in the complaint, died in 2009. His estate is insolvent, as is Gold Coast and South Windsor. The Sandler parties have obtained default judgments against both Gold Coast and South Windsor. Sanchez is the only party to this appeal.

Sanchez's agent and Sanchez, as Desser's principal, is liable for Desser's tortious acts committed within the scope of that agency.

### 2. *Sanchez's Demurrer and the Trial Court's Ruling*

Sanchez demurred to the third amended complaint, arguing he owed no duty, as a fiduciary or otherwise, to the Sandler parties.[3] While a claim for breach of fiduciary duty would lie against Gold Coast and Desser, he asserted, there can be no liability against him as a matter of law absent allegations he authorized or personally participated in the wrongful conduct. He also argued he was not Desser's principal and, therefore, could not be held vicariously liable for Desser's misconduct. The trial court agreed and sustained Sanchez's demurrer to the third amended complaint without leave to amend. The court thereafter signed an order dismissing the action against Sanchez. (Code Civ. Proc., § 581d.)

## DISCUSSION

### 1. *Standard of Review*

On appeal from an order dismissing an action after the sustaining of a demurrer, we independently review the pleading to determine whether the facts alleged state a cause of action under any possible legal theory. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189]; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We may also consider matters that have been judicially noticed. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42 [105 Cal.Rptr.3d 181, 224 P.3d 920].) We give the complaint a reasonable interpretation, "treat[ing] the demurrer as admitting all material facts properly pleaded," but do not "assume the truth of contentions, deductions or conclusions of law." (*Aubry*, at p. 967; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) We liberally construe the pleading with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569]; see *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1120 [100 Cal.Rptr.2d 246].)

" 'Where the complaint is defective, "[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his [or her] complaint . . . ." ' " (*Aubry v. Tri-City Hospital Dist., supra,* 2 Cal.4th at

---

[3] Sanchez's demurrers to the first and second amended complaints were sustained with leave to amend.

pp. 970–971.) We determine whether the plaintiff has shown "in what manner he [or she] can amend [the] complaint and how that amendment will change the legal effect of [the] pleading." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) "[L]eave to amend should *not* be granted where . . . amendment would be futile." (*Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685 [22 Cal.Rptr.2d 807]; see generally *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 373–374 [36 Cal.Rptr.3d 31].)

### 2. Governing Law on Real Estate Brokers

California defines a real estate broker as a person who, for a compensation or in expectation of a compensation, assists people in certain statutorily defined licensed activity, including soliciting borrowers or lenders or performing services for borrowers or lenders in connection with loans secured by real property. (§ 10131, subds. (a), (d).) A licensed broker can be an individual or a corporation. To operate as a corporate broker, however, the corporation must designate a licensed individual broker as the entity's designated officer. (§ 10211; see Cal. Code Regs., tit. 10, § 2740 ["[n]o acts for which a real estate license is required may be performed for, or in the name of, a corporation when there is no officer of the corporation . . ." licensed under § 10211].)

Section 10159.2, subdivision (a), makes the officer designated by a corporate broker licensee pursuant to section 10211 "responsible for the supervision and control of the activities conducted on behalf of the corporation by its officers and employees as necessary to secure full compliance with the provisions of this division, including the supervision of salespersons licensed to the corporation in the performance of acts for which a real estate license is required." Failure to exercise reasonable supervision as required by section 10159.2 is grounds for the Real Estate Commissioner to suspend or revoke the designated officer's real estate license. (§ 10177, subd. (h).)

### 3. Section 10159.2's Duty of Supervision Is Owed to the Corporation, Not to Third Parties

The Sandler parties and Sanchez agree section 10159.2 imposes a duty on the designated officer to supervise the corporate broker's employees. The question in this case is to whom is that duty owed? Absent special circumstances, officers of a corporation "are not responsible to third persons for negligence amounting merely to nonfeasance, to a breach of duty owing to the corporation alone; the act must also constitute a breach of duty owed to the third person." (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770].)

██ The question to whom the duty in section 10159.2 is owed is one of statutory construction, a legal issue for the court. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) In construing the statute, "[o]ur fundamental task . . . is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

██ Here, although section 10159.2 imposes a duty of supervision on the designated officer of the corporate broker, it does not, on its face, expressly state to whom that duty is owed. In light of this ambiguity, we look to extrinsic aids such as historical context and legislative history to determine the Legislature's intent. (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272 [where statutory terms are ambiguous, court may resort to extrinsic sources "including the ostensible objects to be achieved and the legislative history"]; *People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228] [same].)

a. *The designated officer's duty prior to enactment of section 10159.2*

An appellate court first considered whether a designated officer of a corporate broker could be liable to a third party for breaching a duty to supervise the corporate broker's sales employees in *Walters v. Marler* (1978) 83 Cal.App.3d 1 [147 Cal.Rptr. 655] (*Walters*), disapproved on another ground in *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507 [198 Cal.Rptr. 551, 674 P.2d 253]). In *Walters*, a decision that preceded enactment of section 10159.2 by approximately one year (see Stats. 1979, ch. 595, § 1, p. 1856), a real estate purchaser, Calvin O. Walters, Jr., sued his corporate real estate broker, Lampliter Realty, Lampliter's salesperson, James Leseman and Lampliter's designated officer, Kenneth Lee Proulx, among others, alleging Leseman had negligently misrepresented the size of the lot Walters had purchased. At trial the evidence showed Proulx did not authorize, participate in or even know about Leseman's representations. After the jury found Lampliter, Leseman and Proulx liable for negligent misrepresentation, the trial court issued judgment notwithstanding the verdict in favor of Proulx. (*Walters*, at pp. 13, 34.)

The Court of Appeal affirmed, concluding Proulx could not be held personally liable, either directly for negligence or vicariously for negligent

misrepresentation as a matter of law. The court observed Proulx, as the qualifying officer for Lampliter, may have had a duty to exercise reasonable supervision over Lampliter's employees, including Leseman. However, any such duty of supervision was owed to the corporation, not to third parties: "[A]s an agent of the corporation, Proulx owed a duty to Lampliter to supervise the work of Lampliter employees. Proulx may therefore be liable to Lampliter in an action for indemnification. However, Proulx owed no duty to Walters to supervise Leseman's work; he therefore may not be held personally liable to Walters for Leseman's negligent misrepresentations." (*Walters, supra,* 83 Cal.App.3d at p. 35.)

The *Walters* court also rejected the notion Leseman was Proulx's agent, making Proulx vicariously liable for Leseman's misconduct: "In the instant case Leseman was undeniably an agent for both Walters and Lampliter; however, he was not an agent for Proulx. Any action by the qualifying broker, Proulx, must be regarded as an action by the corporation and not by the broker as an individual." (*Walters, supra,* 83 Cal.App.3d at p. 35.)

b.  *Section 10159.2 effectively codifies* Walters

In March 1979, a little less than a year after the decision in *Walters*, the Department of Real Estate sponsored legislation (Assem. Bill No. 985 (1979–1980 Reg. Sess.) § 1) to add section 10159.2 to the Business and Professions Code, making the designated officer of a corporate broker statutorily responsible for supervising the corporate broker's employees. The same legislation also amended section 10177, subdivision (h), to subject the designated officer's real estate license to discipline if that duty of supervision was breached.[4]

Although the legislative history does not mention *Walters* directly, it reveals an unmistakable intent to make express what the *Walters* court found to be an implied duty of supervision, and to make the breach of section 10159.2 subject to a regulatory sanction. According to Senator Thomas Hannigan, the bill's author, the legislation was necessary to cure a gap in the real estate laws that had subjected the corporate broker's real estate license to suspension or revocation as discipline for a salesperson's misconduct, but not the individual license of the designated officer himself or herself: "Under the [existing] law there [are] provisions for the issuance of a broker's license to corporations, entitling them to engage in all the activities permitted to a

---

[4] Prior to the 1979 amendment, former section 10177, subdivision (h), provided for the suspension of the qualifying broker's license if the "broker licensee[] failed to exercise reasonable supervision of the activities of his salesman," but did not address the license of the qualifying officer of the corporate broker. (See Historical and Statutory Notes, 4B West's Ann. Bus. & Prof. Code (2008 ed.) foll. § 10177, p. 194.)

licensed natural person. One of these provisions requires that a corporation have an individual licensed as a broker in his or her own right, serving as a 'designated officer.' The corporate license is issued on the basis of this person's qualifications, but remains a totally separate license. While a corporate license might be revoked for corporate misdeeds, the license of the designated officer would remain untouched unless he or she personally participated in the acts leading to revocation. This duality in licensing leaves the designated officer with only an implied duty to oversee corporate operations. There currently exists no statutory responsibility on the part of the designated officer to supervise the activities of employees as they exercise the corporate license. [¶] [This legislation] provides that failure of a designated officer to exercise reasonable supervision and control over corporate broker activities is grounds for action against the designated officer's personal broker license. It states the affirmative responsibility of the designated officer to exercise such supervision and control." (Assem. Com. on Labor, Employment & Consumer Affairs, Rep. on Assem. Bill No. 985 (1979–1980 Reg. Sess.) as introduced Mar. 19, 1979.)

One committee report on the proposed legislation explained its goal of encouraging direct involvement by the licensed individual to ensure the corporate licensee and its other employees perform competently: "The only way that the active participation of the licensed individual can be insured is by 'piercing the corporate veil' and making the individual licensee vulnerable to action on account of corporate misdeeds, or on account of failure to fulfill corporate responsibilities." (Assem. Com. on Labor, Employment & Consumer Affairs, Rep. on Assem. Bill No. 985 (1979–1980 Reg. Sess.) prepared for hearing Apr. 24, 1979, par. 1.)[5] Focusing on this reference to "piercing the corporate veil," the Sandler parties contend section 10159.2 was intended to hold the designated officer of a corporate broker accountable to the public, not just to the corporation.

When read in context, however, it is apparent the April 24, 1979 report's description of section 10159.2 as making the licensee "vulnerable to action" by "piercing the corporate veil" does not refer to creating a right of action for

---

[5] The April 24, 1979 Assembly committee report described the problem. "The licensing of corporate 'persons' has always been problematic: the state is confronted with the dilemma of guaranteeing the professional competence and proficiency of a legal fiction. Traditionally, the problem is resolved by requiring the direct supervisory control of the corporation's professional actions by a licensed individual who is himself qualified. This is meant to ensure that the corporation knows how to do the job. It is difficult for the state to guarantee the active supervisory role of the licensed individual, however; while a person might be the 'designated officer' or the 'responsible managing officer,' he or she might only be lending a name and license number to the corporation. Problems in this regard have been especially acute among contractors, where individuals have even advertised their license for 'sale' in newspapers." (Assem. Com. on Labor, Employment & Consumer Affairs, Rep. on Assem. Bill No. 985, prepared for hearing Apr. 24, 1979, par. 1.)

third party clients of the corporate broker against the designated officer. Rather, recognizing the license of the designated officer was "beyond the Department's reach" (Assem. Com. on Labor, Employment & Consumer Affairs, Rep. on Assem. Bill No. 985 (1979–1980 Reg. Sess.) prepared for hearing Apr. 24, 1979), the Legislature intended to subject the designated officer to the same discipline—suspension or revocation of his or her license—as the corporate broker. (See *In re Grabau* (Bankr. N.D.Cal. 1993) 151 B.R. 227, 232 ["Nothing in the statutory scheme of the Real Estate Act or the plain language of § 10159.2, suggests that it creates a private right of action against the designated broker, particularly in light of detailed provisions for disciplinary sanctions set forth in §§ 10175–10185. The most obvious interpretation of § 10159.2 is that it simply extended this disciplinary scheme to apply against designated brokers who failed to properly supervise employees."].)

█ Our conclusion sections 10159.2 and 10177, subdivision (h), were intended to codify the implied duty to the corporation recognized in *Walters*, as well as to create a regulatory sanction against the qualified officer's real estate license, is reinforced by reference to section 7068.1, which imposes a similar duty of supervision on the responsible managing employee of a licensed construction contractor. (See *People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154] [courts may be aided in interpreting ambiguous statutory language by referring to other statutes applying similar language to analogous subjects]; *Giorgianni v. Crowley* (2011) 197 Cal.App.4th 1462, 1478 [129 Cal.Rptr.3d 546] [same].) In language substantially similar to section 10159.2, section 7068.1 provides the person qualifying on behalf of an individual or construction firm under section 7068 "shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations as is necessary to secure full compliance with this chapter . . . ." Section 7068.1 has long been interpreted to create a duty by the responsible managing employee to the corporate employer, but not to a third party client of the corporate employer. (*Swickheimer v. King* (1971) 22 Cal.App.3d 220, 224–225 [99 Cal.Rptr. 176] (*Swickheimer*).)

In *Swickheimer* the plaintiff sued both the construction company with whom he had contracted to make improvements to real property and the company's responsible managing licensee, Lewis King. The plaintiff acknowledged King had not participated in the deficient construction; in fact, he had been ill and incapacitated and did not know of the contract, much less the construction work undertaken by the company's employees. However, he argued King's breach of his duty of supervision codified in section 7068.1 resulted in deficient work by the contractor's employees and damaged the plaintiff. The Court of Appeal rejected the claim against King, concluding section 7068.1 was regulatory and disciplinary in nature. It did not create a

duty to third parties and therefore could not be a basis for the managing employee's personal liability. (*Swickheimer, supra,* 22 Cal.App.3d at p. 225.)

██ The Legislature was well aware of the *Swickheimer* court's construction of section 7068.1 when it enacted section 10159.2. (See *People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288] ["the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' "]; *Nelson v. Pearson Ford Co.* (2010) 186 Cal.App.4th 983, 1008 [112 Cal.Rptr.3d 607] [same].) In fact, section 7068.1 was cited as a model for section 10159.2: In sponsoring section 10159.2, the Department of Real Estate expressly observed the legislation would be "similar to legislation currently in effect regarding contractors' licenses (Business and Professions Code section 7068.1.)" (Dept. of Real Estate, Proposal and Analysis of Assem. Bill No. 985 (1979–1980 Reg. Sess.) Feb. 9, 1979.) The fact sheet prepared in connection with the Legislature's consideration of Assembly Bill No. 985 states, "Contractors' licenses issued to corporations require the naming of a 'responsible managing employee' who is responsible for licensed acts of the corporate contractor. This bill would do the same for real estate corporate licensees." (Fact Sheet analysis of Assem. Bill No. 985, Apr. 19, 1979.) In fashioning a statute analogous to section 7068.1, absent a clearly expressed contrary intent, we conclude the Legislature intended the scope of section 10159.2's supervisorial duty be interpreted the same way. (See, e.g., *City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 606 [110 Cal.Rptr.3d 718, 232 P.3d 701] ["[b]ecause of the similar language in these two jurisdictional statutes, and because of the legal presumption that the Legislature is deemed to be aware of existing judicial decisions that have a direct bearing on the particular legislation enacted [citations], we conclude that when in 2000 the Legislature transferred jurisdiction over the MMBA from the courts to PERB it did so in light of this court's existing case law"]; *Overstreet,* at p. 897; *Nelson,* at p. 1008.)

### 4. *Sanchez Cannot Be Held Vicariously Liable for Breach of Fiduciary Duty Under an Agency Theory Based Solely on His Failure to Supervise Desser*

██ Corporate employers may be held vicariously liable for the tortious acts of their agents committed within the scope of the agency or employment. (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676]; *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296 [48 Cal.Rptr.2d 510, 907 P.2d 358]; *California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1581 [23 Cal.Rptr.2d 462].) However, absent special circumstances, it is the

corporation, not its owner or officer, that is the principal or employer and thus subject to vicarious liability for torts committed by its employees or agents. (See *Meyer v. Holley* (2003) 537 U.S. 280, 286 [154 L.Ed.2d 753, 123 S.Ct. 824] ["[a] corporate employee typically acts on behalf of the corporation, not its owner or officer"]; *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., supra*, 1 Cal.3d at p. 595 [same].) Accordingly, under traditional agency principles, it is Gold Coast, as Desser's employer, not Sanchez, who may be held liable for Desser's torts committed within the scope of his employment.

■ The Sandler parties advance a different agency theory in an attempt to hold Sanchez vicariously liable for Desser's misconduct. Although Sanchez was not Desser's employer, he was, they argue, Desser's principal, making him liable for Desser's torts committed within the scope of that agency. In support of this position they rely largely on *Holley v. Crank* (9th Cir. 2004) 400 F.3d 667 (*Holley II*). We are, of course, not bound by this federal court decision interpreting California law, and we find its reasoning unpersuasive as applied to the case at bar.

In the *Holley* cases an interracial couple sued their corporate real estate broker, Triad, and Triad's designated officer, David Meyer, alleging Triad's real estate salesperson, Grove Crank, violated racial discrimination prohibitions in the federal Fair Housing Act (42 U.S.C. §§ 3604(b), 3605(a)). The complaint sought to hold Meyer, who was also the owner and president of Triad, and Triad itself vicariously responsible for Crank's violation.

Initially, the Ninth Circuit held, although Meyer was not Crank's employer, regulations promulgated under the Fair Housing Act had expanded the principles of vicarious liability to include those who directly control or have the right to control the conduct of the tortfeasor, even if they were not the tortfeasor's employer and were not involved in the discrimination. (*Holley v. Crank* (9th Cir. 2001) 258 F.3d 1127, 1134–1135.)

The United States Supreme Court reversed that decision, holding nothing in the Fair Housing Act suggested a congressional intent to expand traditional principles of vicarious liability. (*Meyer v. Holley, supra*, 537 U.S. at p. 286.) The Court also rejected the Holleys' argument section 10159.2's duty to supervise was, by itself, sufficient to create a principal-agent relationship between Meyer and Crank that would make Meyer vicariously liable for Crank's conduct: the respondents argued ". . . California law itself [(§ 10159.2)] creates what amounts, under ordinary common-law principles, to an employer/employee or principal/agent relationship between (a) a corporate officer designated as the broker under a real estate license issued to the corporation, and (b) a corporate employee/salesperson. [Citation.] Insofar as this argument rests *solely* upon the corporate broker/officer's *right to control*

the employee/salesperson, the Ninth Circuit considered and accepted it. [Citation.] But we must reject it given our determination . . . that the 'right to control' is insufficient by itself, under traditional agency principles, to establish a principal/agent or employer/employee relationship." (*Meyer*, at p. 291.) Whether other facts, coupled with that right to control, were sufficient to give rise to a principal-agent relationship under common law agency principles, the court held, was a separate question, one it declined to consider in the first instance. (See *id.* at pp. 291–292 ["in the absence of consideration of that matter by the Court of Appeals, we shall not consider it"].)

On remand the Ninth Circuit considered the question left open by the Supreme Court—whether, based on the evidence presented with Meyer's summary judgment motion, Meyer could be held vicariously liable for Crank's discriminatory conduct under traditional agency principles. The court concluded he could. (*Holley II, supra,* 400 F.3d at pp. 673–674.) Although "liability in the typical employment relationship runs between the corporation and the salesperson and between the corporation and the supervisor, but not between the salesperson and the supervisor" (*id.* at p. 671), the court concluded the employment relationship between Meyer and Crank was "atypical because California law [(§ 10159.2)] makes the designated real estate broker of a real estate corporation personally responsible for the supervision of the corporation's salespersons. . . . When Meyer delegated this responsibility to Crank, he created an agency relationship between himself and Crank, which made Meyer vicariously liable as the principal for the discriminatory actions of Crank as his agent." (*Holley II*, at p. 671.)

In reaching this conclusion, the *Holley II* court acknowledged, for an agency relationship to exist, a principal must consent to the agent acting on his behalf and subject to his control, and the agent must consent to act for the principal. (*Holley II, supra,* 400 F.3d at p. 673; see *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 91 [133 Cal.Rptr.3d 155] [" ' " '[a]gency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act' " ' "].) Nonetheless, the evidence (viewed in the light most favorable to the plaintiffs) indicated Meyer intended to turn the real estate business over to Crank so Meyer could pursue another career and "it was agreed" Meyer would remain Triad's designated officer/broker until Crank got his own broker's license. Although Meyer understood he remained personally responsible to ensure Triad's agents acted lawfully, he "agreed to delegate those responsibilities to Crank so that Crank could continue to run Triad as a real estate brokerage." (*Holley II*, at p. 673.) In addition, the evidence established ". . . Crank agreed to carry out this duty on behalf of Meyer subject to Meyer's ultimate control." (*Id.* at p. 674.) Based on this

factual showing the Court of Appeals concluded there was "evidence of an agreement to delegate this personal duty as an officer/broker, to be filled on a day to day basis by Crank, to assure that state and federal laws were being observed in the operation of Triad's real estate business." (*Ibid.*)

Attempting to plead facts similar to those essential to the holding in *Holley II*, the Sandler parties allege, like Meyer, Sanchez had no involvement in the day-to-day activities of Gold Coast. He effectively lent his license to the company and, in so doing, delegated his duty to supervise to Desser, subject to Sanchez's ultimate supervision in accordance with California law. Accordingly, the Sandler parties argue Sanchez can be held vicariously liable for Desser's conduct so long as it was committed within the scope of that agency.

As discussed, the United States Supreme Court in *Meyer v. Holley, supra,* 537 U.S. 280 directly rejected the contention that section 10159.2's supervisory duty itself created an agency relationship between the designated officer and the corporate broker's employees within the context of the federal Fair Housing Act. Although the Supreme Court did not rule out the possibility of a principal-agent relationship based on additional factors, the existence of the supervisory duty alone was not sufficient. If, as the Sandler parties appear to suggest, the Ninth Circuit concluded in *Holley II* that simple abandonment of the statutory duty to supervise equated to an implied delegation of Meyer's responsibilities to Crank, that ruling is inconsistent with the Supreme Court's holding that more than a statutory right to control is needed to establish an agency relationship. If, as we believe is far more likely, the Ninth Circuit found there was some form of actual agreement between Meyer and Crank for Crank to assume the responsibilities imposed on the designated officer/broker by section 10159.2, its holding is inapposite.

We need not decide whether we agree with the Ninth Circuit that, by way of an express agreement or some other similar circumstance, a designated officer and real estate salesperson can ever create a principal-agent relationship. Even if such a relationship could exist, as the United States Supreme Court explained, more is needed to create such a unique agency relationship between two employees than the officer's mere inaction. Because the Sandler parties acknowledged in the trial court they are unable to plead any additional facts to establish that relationship, the court properly sustained Sanchez's demurrer without leave to amend and dismissed the action against him.[6]

---

[6] In light of our holding the Sandler parties have not, and cannot, plead facts sufficient to hold Sanchez liable for Desser's conduct, we need not consider the policy argument of amicus curiae, the California Association of Realtors, that subjecting the designated officer to personal liability for failure to supervise would cause substantial harm to the real estate industry and the public.

## DISPOSITION

The order of dismissal is affirmed. Sanchez is to recover his costs on appeal.

Woods, J., and Zelon, J., concurred.